UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| CHARLOTTE D. MAYS, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | CAUSE NO.: 1:10-cv-12 |
|  | ) |  |
| MICHAEL J. ASTRUE, | ) |  |
| Commissioner of Social Security, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## OPINION AND ORDER

Plaintiff Charlotte Mays appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for Supplemental Security Income ("SSI").[1] (Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED and the case REMANDED for further proceedings.

## I. PROCEDURAL HISTORY

Mays applied for benefits on October 15, 2004, alleging that she became disabled as of September 1, 2001. (Tr. 70-73.) The Commissioner denied her application initially and upon reconsideration, and Mays requested an administrative hearing. (Tr. 24-27, 51-57.) Administrative Law Judge ("ALJ") Frederick McGrath conducted a hearing on September 17, 2007, at which Mays, who was represented by counsel; Leonard M. Fisher, a vocational expert ("VE"); and Greg Marshall, the claimant's friend and roommate, testified. (Tr. 788-812.)

On May 10, 2008, the ALJ rendered an unfavorable decision to Mays, concluding that she

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

1

was not disabled because she could perform a significant number of jobs in the regional economy despite the limitations caused by her impairments. (Tr. 14-23.) The Appeals Council denied Mays's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 2-10, 765-89.) Mays filed a complaint with this Court on January 15, 2010, seeking relief from the Commissioner's final decision. (Docket # 1.) On appeal, Mays argues that the ALJ improperly evaluated the opinions of the state agency psychologists, Dr. Randal Horton and Dr. J. Pressner, and improperly evaluated her symptom testimony regarding her mental illness. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Br.") 10-12.)

## II. FACTUAL BACKGROUND

### A. Background

Mays was 44 years old at the time of the ALJ's decision and had completed the 11th grade. (Tr. 23, 70, 102.) Prior to her alleged disability onset she worked as an assembly line worker, dietary worker, light industrial worker, medical records clerk, and in a janitorial service. (Tr. 97.) Mays alleges that she is disabled due to major depressive disorder and post-traumatic stress disorder ("PTSD").[2] (Br. 2.)

### B. Summary of Relevant Medical Evidence

On July 7, 2004, Mays was seen at Park Center Mental Health Facility by Judy Woodyard. Mays presented with complaints of depression, difficulty sleeping, under-eating, loss of interest, loss of pleasure, difficulties with concentration, and feelings of worthlessness. (Tr. 700.) She also reported anxiety and excessive worrying, aches and pains, compulsive behavior, and a history of

---

[2] Mays also originally alleged that she was disabled due to a variety of back and knee problems. The ALJ found that these impairments did not rise to the level of disability and Mays does not dispute the Commissioner's findings on the severity of her physical problems and limitations. (Br. 2 n.3.) In the interest of brevity, therefore, this Opinion recounts only the portions of the 812-page administrative record that concern Mays's alleged mental impairments.

trauma. (Tr. 700.) Mays informed Woodyard that her current symptoms had been present for about one year and she described her anxiety and depression as serious. (Tr. 700.) She stated that her depression and anxiety kept her from sleeping, caused her to lose focus, and prevented her from having an appetite. (Tr. 700.)

She believed that her lack of self-esteem resulted from a history of domestic violence. (Tr. 700.) She reported that she has been depressed and anxious since she met her children's father in 1986. (Tr. 701.) Mays informed Woodyard that she had spent 15 years in an abusive marriage. (Tr. 701.) She related that she was prescribed Prozac in the mid-1990s, while she was living in Arizona, and she believed that it helped her. (Tr. 701.) She also participated in individual and family counseling for domestic violence while living in Arizona. (Tr. 701.) Her family physician prescribed her Prozac and Celexa. (Tr. 701.) She informed Woodyard that she did not take her medicine every day and she was not sure how much it actually helped her. (Tr. 701.) Mays stated that she coped with her depression by crying, sitting in her house, staying in her room, and avoiding people. (Tr. 701.) She also attempted to cope with her anxiety by praying, talking to herself, and trying to calm herself down. (Tr. 701.)

Woodyard found that Mays's history suggested poor coping skills, judgment, and insight. (Tr. 702.) Woodyard diagnosed Mays with major depressive disorder, recurrent, severe, with psychotic features; generalized anxiety disorder; and a rule-out of PTSD. (Tr. 702.) She assigned Mays a Global Assessment of Functioning ("GAF") score of 50. (Tr. 336.)[3]

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). The higher the GAF score, the better the individual's psychological, social, and occupational functioning. A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment

Approximately one week later, Mays was seen by Dr. Jay Fawver at Park Center. (Tr. 697.) She informed him that her depression was persistent and that she was experiencing social withdrawal, loss of appetite, poor concentration, feelings of worthlessness, excessive worry, body aches, and intermittent suicidal thoughts. (Tr. 697.) She also admitted to occasional auditory hallucinations in the form of an "outside voice" that was instructing her to kill herself. (Tr. 697.) Mays reported that she suffered from physical and sexual abuse throughout her previous marriage, which has resulted in nightmares, lack of sleep, and daytime flashbacks. (Tr. 697.) Although she told Dr. Fawver that she was having a "good day" at the time of her examination, she informed him that her depression was generally persistent. (Tr. 697.)

On a mental status exam, Dr. Fawver found that Mays appeared to be mildly overweight and was very personable and congenial. (Tr. 698.) She established good eye contact and intermittently smiled, but overall exhibited a moderately depressed mood with a full range of affect. (Tr. 698.) Dr. Fawver found that she demonstrated logical, sequential, and pertinent thought processing. (Tr. 698.) Dr. Fawver also noted Mays's occasional auditory and visual hallucinations of communicating with her deceased grandmother and friend. (Tr. 698.) Dr. Fawver diagnosed Mays with major depression, recurrent, with psychotic features, as evidenced by auditory hallucinations of a commanding nature, intermittently; and PTSD, chronic. (Tr. 698.) He prescribed her Zoloft and Zyprexa in an effort to relieve her PTSD and psychotic depression. (Tr. 698.)

In September 2004, Mays saw Viann Ellsworth at Park Center. Mays stated that she was

---

in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

taking the Zoloft and Zyprexa, but admitted to some suicidal thoughts. (Tr. 262.) On mental status exam, her affect was somewhat blunted and her mood was depressed. (Tr. 262.) She showed some thoughts of helplessness and hopelessness, as well as some auditory hallucinations. (Tr. 262.)

In December 2004, Dr. Rosalind Huang performed a psychological evaluation at the request of the Social Security Administration. (Tr. 554.) Mays recounted her history of physical and sexual abuse during her previous marriage and also stated that her ex-husband shot her in the knee following their divorce. (Tr. 554-55.) She informed Dr. Huang that her past abuse caused her to suffer from nightmares and consequently limited her sleep to approximately three hours each night. (Tr. 554-55.) She stated that she rarely had a good day and that her depression was fairly persistent. (Tr. 554-55.)

Mays told Dr. Huang that she likes to stay in her room in the dark and often cries for no reason. (Tr. 557.) She stated that her children frequently take care of her and she felt like a bad mother. (Tr. 557.) She told Dr. Huang that she takes a shower every other day and that most of the time her children do the cooking, cleaning, and laundry, and her sister does the grocery shopping. (Tr. 557.)

Dr. Huang concluded that Mays suffers from nightmares and flashbacks. (Tr. 557.) She noted that Mays cries frequently and feels as if she has not taken care of her children. (Tr. 557.) Dr. Huang found that Mays suffers from a severe depressive disorder with psychotic features, chronic PTSD, migraines, and knee problems. (Tr. 558.) She assigned Mays a GAF Score of 50 and noted that although she was supposed to be taking Zoloft and Zyprexa, she did not have the funds to purchase her medication. (Tr. 558.)

On January 19, 2005, Dr. Randal Horton, a non-examining state agency psychologist,

5

completed a Psychiatric Review Technique. (Tr. 521-36.) He concluded that Mays had a moderate restriction in her activities of daily living, as well as moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. (Tr. 531.) That same day, Dr. J. Pressner conducted a Mental Residual Functional Capacity Assessment of Mays. (Tr. 517-19.) He found that Mays had moderate limitations in her ability to maintain attention and concentration for an extended period of time and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 517.) He also determined that Mays had moderate limitations in her ability to complete a normal workday and workweek without interruptions and to get along with coworkers without distracting them or exhibiting behavioral extremes. (Tr. 518.) Dr. Pressner concluded that Mays retained the ability to perform simple, routine tasks. (Tr. 519.)

Mays received additional mental health treatment at Park Center from January to October 2006. In March 2006, Mays was evaluated by Dr. Vijoy Varma, who diagnosed her with a major depressive disorder, recurrent, severe, with psychotic features. (Tr. 202.) Dr. Varma noted Mays's two past suicide attempts and her long history of depression. (Tr. 199.) He also discussed Mays's claim that she hears voices and that she has been experiencing such hallucinations for the last sixteen years. (Tr. 199.) Dr. Varma assigned Mays a current GAF score of 45 and prescribed her Zoloft, Geodon, and Trazadone for her depression and psychotic symptoms. (Tr. 202.)

*C. Mays's Hearing Testimony*

On September 17, 2007, Mays appeared with counsel and testified before ALJ Frederick McGrath. (Tr. 788-812.) Mays stated that she had completed the 11th grade and had three children. She testified that she stopped working because of her physical problems; specifically, swelling in

her knee prevented her from standing for extended periods of time. (Tr. 792.) Mays claimed that she experienced pain throughout her entire body and, at the time she stopped working, she was already experiencing depression and mental problems. (Tr. 792.)

Mays testified that she has difficulty sleeping because she had been a victim of domestic violence and was suffering from PTSD. (Tr. 794.) She claimed it takes her nearly four hours to fall asleep every night and that some nights she does not fall asleep until 4:00 or 5:00 a.m., but then wakes up at 6:00 a.m. (Tr. 795.) She stated that she takes sleeping pills, which make her groggy, sluggish, and irritable when she wakes up. (Tr. 795-96.) Mays testified that, because of her mood, she sometimes goes for as long as four days without eating. (Tr. 803.) She also stated that, because of her depression and PTSD, she liked to be left alone in the dark, rarely attended any family gatherings, and experienced flashbacks. (Tr. 799-800.)[4]

Leonard Fisher, the VE, testified about what types of work Mays may be able to carry out. (Tr. 808-12.) He discussed Mays's past work and identified 300 medical clerk jobs, 6,000 to 7,000 sales associate positions, and 2,000 receptionist jobs in the local region. (Tr. 808-9.) Fisher then testified that an individual who has to take breaks or lay down to relieve the symptoms of depression or PTSD for two hours out of an eight hour work day would be unable to perform any full-time competitive work. (Tr. 810-11.) He also stated that an individual who cannot do work that involves significant contact with the public would be unable to work as an information clerk or a receptionist. (Tr. 811.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

---

[4] The testimony of Greg Marshall essentially collaborated that of Mays.

transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. § 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id*. The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On May 10, 2008, the ALJ rendered his opinion. (Tr. 14-23.) He found at step one of the five-step analysis that Mays had not engaged in substantial gainful activity since her application date. (Tr. 16.) At step two, he determined that Mays did not have any severe mental impairments. (Tr. 17.) At step three, he determined that Mays did not have an impairment or combination of impairments that was severe enough to meet a listing. (Tr. 18.) Before proceeding to step four, the ALJ found that Mays's disability allegations and testimony were not reliable. (Tr. 18-21.) Additionally, the ALJ determined that Mays had the mental RFC to carry out instructions at all

---

[5] Before performing steps four and five, the ALJ must determine the claimant's Residual Functional Capacity ("RFC")—the tasks the claimant can do despite her limitations. 20 C.F.R §§ 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 416.920(e).

9

levels. (Tr. 17-18.)

The ALJ found at step four that Mays was able to perform her past relevant work as a medical records clerk and sales associate. (Tr. 21.) At step five, he concluded that Mays had acquired skills from her past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy, such as information clerk (300 jobs in the regional economy), receptionist (2,000 jobs in the regional economy), and a typist (200 jobs in the regional economy). (Tr. 22.) He therefore concluded that Mays was not under a disability at any time from the alleged onset date through the date of the decision, and her claim for benefits was denied. (Tr. 23.)

## *C. Discussion*

Mays argues that the ALJ erred when he rejected the opinions of the state agency psychologists, Dr. Randal Horton and Dr. J. Pressner, and found that Mays did not have a severe mental impairment.[6] Mays notes that the ALJ afforded little weight to the parts of the opinions that limited her ability to adhere to production standards and interact with workers "because the objective medical evidence and [Mays's] own statements of record do not support the additional limitations indicated." (Br. 10-11; Tr. 17.) Mays claims that the ALJ committed reversible error when he dismissed the state agency opinions without discussing why the objective medical evidence and statements of records do not support the limitations. (Br. 10.) Mays then highlights numerous pieces of medical evidence she claims support the state agency doctors' limitations and that the ALJ apparently failed to consider.

---

[6] Mays also argues that the ALJ improperly evaluated her symptom testimony. As will be discussed, however, Mays's first argument is persuasive and warrants a remand. Accordingly, the Court need not reach Mays's additional argument.

10

In response, the Commissioner offers a detailed discussion of Mays's medical history and claims that the ALJ did sufficiently consider the medical evidence before rejecting the opinions of the state agency physicians. Much of the Commissioner's brief however, relies on evidence that is not found in the ALJ's opinion and frequently advances impermissible post hoc arguments. The *Chenery* doctrine, *see SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943), forbids an agency's lawyers from defending the agency's decision on grounds that the agency itself has not embraced. *See also Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (per curiam); *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). "[T]he ALJ (not the Commissioner's lawyers) must build an accurate and logical bridge from the evidence to [his] conclusion." *Steele v. Barnhart,* 290 F.3d 936, 941 (7th Cir. 2002) (internal quotations and citations omitted). *See also Mirza v. Barnhart*, No. 00 C 8003, 2002 WL 731781, at *7 (N.D. Ill. Apr. 25, 2002) ("[T]he Commissioner's decision must stand or fall with the reasons set[] forth in the ALJ's decision."). In considering the arguments of Mays and the Commissioner, the Court must therefore restrict its consideration to the reasoning employed by the ALJ in his opinion.

With that limitation in mind, Mays's argument that the ALJ erred when evaluating the findings of the state agency physicians is persuasive. In his decision, the ALJ acknowledged the opinion of Dr. Pressner (although not by name) and noted that: "A state agency psychologist provided an opinion indicating that [Mays] retains the mental residual functional capacity to carry out simple and detailed tasks with no production requirements and occasional interaction with coworkers." (Tr. 17.) The ALJ then agreed that Mays is able to carry out simple and detailed tasks, but afforded little weight to the finding that she is limited in her ability to adhere to production standards and interact with coworkers. (Tr. 17.) In making this finding, however, the

11

ALJ mischaracterized the opinion of Dr. Pressner, who did not find that Mays could perform "detailed" tasks, but rather limited her to "routine" tasks. (Tr. 519.) The ALJ does not mention Dr. Horton's opinion in his decision.

In misconstruing and partially rejecting Dr. Pressner's opinion—and, apparently, Dr. Horton's as well—the ALJ simply recited in a conclusory manner that "the objective medical evidence and the claimant's own statements of record do not support the additional limitations indicated." (Tr. 17.) The ALJ did not, however, point to any examples of medical evidence and Mays's own statements that were inconsistent with the state agency psychologists' opinions. This constitutes legal error, as "the ALJ must . . . explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005). *See also Ulloa v. Barnhart*, 419 F. Supp. 2d 1027, 1036 (N.D. Ill. 2006) (remanding the ALJ's decision where he stated that a physician's opinion was inconsistent with the objective medical evidence and the overall record but failed to explain *how* it was inconsistent); *Singleton v. Astrue*, No. 3:06-CV-0760-CAN, 2008 WL 425528, at *5 (N.D. Ind. Feb. 13, 2008) (finding that the ALJ did not adequately articulate his reasoning for discounting certain physicians' opinions where he "cited no medical evidence and, more importantly, did not explain how such evidence contradicted their opinions"). *Cf. Hudson v. Soc. Sec. Admin.*, No. 3:07-CV-117 CAN, 2008 WL 474207, at *5 (N.D. Ind. Feb. 19, 2008) (affirming the ALJ's decision to discount a physician's opinion where the ALJ specifically referred to particular parts of the physician's opinion as evidence that inconsistencies existed to support his conclusion).

With the summary treatment and mischaracterization of Dr. Pressner's opinion and the apparent failure to consider Dr. Horton's opinion, the Court cannot say that the ALJ met his duty

to consider all the relevant evidence and minimally articulate his findings. *See Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) (stating that "the ALJ's decision must be based upon consideration of all the relevant evidence and that the ALJ must articulate at some minimal level his analysis of the evidence") (internal quotation marks omitted). Indeed, there is evidence in the record that could support the state agency psychologists' limitations. For example, Dr. Fawver diagnosed Mays with severe depression and noted that she experiences intermittent "commanding" auditory hallucinations. (Tr. 698.) Dr. Ellsworth also noted that Mays experienced auditory hallucinations and that she admitted to considering suicide. (Tr. 262.) Dr. Varma diagnosed Mays with major depressive disorder and also believed that Mays might have a panic disorder with claustrophobia. (Tr. 202.)

Of course, the ALJ is in no way bound to assign this evidence persuasive weight, but he is bound to at least recognize its existence and give it minimal consideration. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (emphasizing that an ALJ must not ignore evidence which contradicts his opinion, but must evaluate the record fairly); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (opining that when probative evidence is left unmentioned by the ALJ, the court is left to wonder whether it was even considered); *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000) (noting that the ALJ "must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position"). With the combination of the ALJ's mischaracterization of Dr. Pressner's opinion, his conclusory rejection of the remainder of Dr. Pressner's opinion, and his apparent failure to consider Dr. Horton's opinion, the Court cannot say that the ALJ has built "an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Accordingly, this case must be remanded for

further proceedings.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED and this case is REMANDED so that the ALJ may further consider the opinions of the state agency psychologists, Dr. Horton and Dr. Pressner.

SO ORDERED.

Enter for November 10, 2010.

S/Roger B. Cosbey  
Roger B. Cosbey,  
United States Magistrate Judge